UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BERNABE ENCARNACION, 91-B-0943,

                                              Plaintiff,         No. 04-CV-6064 CJS

-vs-

                                                                       DECISION AND ORDER

LESTER WRIGHT, et al.,

                                              Defendants.

_____

APPEARANCES

For Plaintiff:           Bernabe Encarnacion, pro se
                           Southport Correctional Facility
                           P.O. Box 2000
                           Pine City, New York 14871

For Defendants:      Tamara B. Christie, Esq.
                           Gary Levine, Esq.
                           Office of the New York State
                           Attorney General
                           144 Exchange Boulevard
                           Rochester, NY 14614

INTRODUCTION

This is an action pursuant to 42 U.S.C. § 1983 in which the plaintiff, Bernabe Encarnacion ("Plaintiff"), a prison inmate confined at Southport Correctional Facility ("Southport"), alleges that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution. Now before the Court is the Defendants' summary judgment motion [#32], and two

applications by Plaintiff for injunctive relief [#31] [#47]. For the reasons that follow, Defendants' application is granted, Plaintiff's applications are denied, and this action is dismissed.

## BACKGROUND

Plaintiff is suing four individuals who, at all relevant times, were employed by the New York State Department of Correctional Services ("DOCS"): Lester Wright ("Wright"), DOCS Health Commissioner; Michael McGinnis ("McGinnis"), Superintendent of Southport; Jose Lopez, M.D. ("Lopez"), a physician at Southport; and Karen Dyal-Weaver, R.N. ("Dyal-Weaver"), a nurse at Southport. The Complaint [#1] in this action alleges that Defendants were deliberately indifferent to medical conditions involving Plaintiff's right foot, left eye, hips, and back. (Complaint [#1]). Plaintiff maintains that, as a result of Defendants' failure to provide medical care, he has suffered pain, weight loss, internal bleeding, mouth and stomach ulcers, fatigue, and sleeplessness. (Complaint ¶ 23). In general, Plaintiff's ambulatory health record, which is several inches thick, indicates that he was seen by medical staff on at least a weekly basis, and more often, on a daily basis.[1] The record further indicates that Plaintiff was regularly treated with medications including Loratadine, Naprosyn, Ultram, Percogesic, Ibuprofen, eye drops, and Zantac.

*Plaintiff's Foot Injury*

---

[1]Plaintiff alleges that during a two year period, February 2000 through April 2002, he was not allowed to see any doctors. (Complaint [#1] ¶ 17) This claim is belied by the medical record, which indicates that Plaintiff was placed on "MD callout" several times during that period. However, even if Plaintiff did not actually see a doctor during that period, the record clearly indicates that he was seen on a regular basis by nurses and other medical providers.

Plaintiff's foot injury occurred in 1978, when he sustained a shotgun wound to his right foot while living in Puerto Rico. This injury resulted in the amputation of one toe, and left a number of buckshot pellets embedded in Plaintiff's foot. Plaintiff indicates that his resultant foot deformity is extremely painful. Nevertheless, Plaintiff is able to run and exercise. For example, a medical note dated August 5, 1991, indicates: "Deformity right foot [gun shot wound] in 1978 had surgery done on it[.] Able to ambulate and wt. [weight] bear able to do sports and exercises. Give pass to wear sneakers all the time." Further, medical notes dated May 20, 1994 and July 5, 1994 indicate that Plaintiff is able to run.

Prior to 1999, Plaintiff was housed at Elmira Correctional Facility ("Elmira"). In 1991, doctors at Elmira provided Plaintiff with specially-designed orthopedic shoes. According to Plaintiff, the doctors told him that he would receive a new pair of orthopedic shoes each year. In 1993, plaintiff requested a new pair of orthopedic boots, but never received them. In that regard, Plaintiff's medical records indicate that he was provided orthopedic arch supports and sneakers, because he was housed in the Segregated Housing Unit ("SHU") where inmates were not permitted to have boots.

Subsequently, Cheng Yin, M.D. ("Yin"), a physician at Elmira, referred Plaintiff for an orthopedic consultation regarding the injured right foot. On December 15, 1997, an unnamed[2] orthopedic specialist examined Plaintiff and indicated that Plaintiff "may benefit from reconstruction grafting." The specialist further indicated that Plaintiff should wear "high top sneakers for now." On March 3, 1998, another orthopedic consultant, Dr. Henry, indicated that he wanted to schedule Plaintiff for foot surgery. However, on

---

[2]The doctor's signature is illegible.

March 11, 1998, a Review Committee denied Plaintiff's request for surgery. The comments accompanying the Committee's decision state: "Repair of twenty year old injury in a 42 year old man does not appear to be medically necessary. Is there new evidence of interference with daily activities? Is there any assurance of benefit not harm from RX?"

In 1999, Plaintiff was transferred to Southport. In January 2000 and August 2002, Plaintiff was examined by orthopedic specialists, neither of whom recommended surgery. Apparently, the first specialist was Lopez, who, Plaintiff alleges, told Plaintiff in January 2000 that he was not a candidate for surgery, based on the decision of the Review Committee. (Pl. Aff. [#44-1] p. 8) The second specialist, Dr. Kaempffe, indicated that Plaintiff was not a candidate for surgery because of the nature of the injury and the risk for infection. Nevertheless, Plaintiff continued to request surgery. In August 2002, Plaintiff asked Dyal-Weaver if he could obtain a second opinion regarding surgery, to which Dyal-Weaver responded that such a consultation would be at Plaintiff's own expense. (Complaint ¶ 21). On October 4, 2002, Plaintiff again requested surgery, and non-party Nurse Practitioner Jill Northrop advised him that he was not a good candidate for such surgery, "per consult 7/26/02."

On May 6, 2003, Plaintiff told a non-party nurse that he wanted "special sneakers." The nurse, noting that Plaintiff did not have a boot permit, advised Plaintiff to have his feet measured by the "state shop." On October 31, 2003, Plaintiff asked another non-party nurse that he be given medical boots for "foot problems." However, the nurse reviewed Plaintiff's medical chart and found no recommendation for such boots. On November 26, 2003, Plaintiff again requested "medical shoes," and a note

4

made the following day indicates that Plaintiff would need a boot permit.  On December 10, 2003, a note indicates that Plaintiff was asked to sign a permit for boots, but refused, indicating that he preferred to wear sneakers.  On July 16, 2004, in response to another request by Plaintiff for "medical boots," a non-party medical staff member indicated that Plaintiff's "boot permit" had been discontinued, because Plaintiff had refused to sign the boot permit in December 2003.

*Plaintiff's Back and Hip Pain*

Plaintiff also suffers from hip and back pain.  On May 20, 1994, an x-ray was taken of Plaintiff's right hip, which showed "mild degenerative changes."  On May 28, 2002, an x-ray of Plaintiff's back showed some degenerative disease of the lower spine.  Subsequently, medical staff at Southport have provided Plaintiff with Ultram and Percogesic for hip and back pain, although the Percogesic has been discontinued at various times because it was causing rectal bleeding.  Ultram has also been discontinued at various times, based on Plaintiff's alleged noncompliance in taking the medication.  For example, on June 23, 2004, a note indicates that Plaintiff refused his Ultram, because it was given to him in crushed form, rather than pill form.  On June 25, 2004, a note indicates that Plaintiff's Ultram prescription was discontinued, after Plaintiff threw his Ultram on the floor, stating, "I'm not taking that."  On June 28, 2004, a note indicates that Plaintiff's Ultram was discontinued due to his non-compliance, though he was still receiving Percogesic.  Plaintiff believes that he should be receiving some additional treatment for his back, but does not know what type of treatment. (Pl. Dep. 32)

*Plaintiff's Eye Pterygium*

Plaintiff also complains of a pterygium, or fleshy growth, in his left eye.  On April

5

15, 1996, an opthalmologist examined Plaintiff and recommended "monitor pterygium yearly." Subsequently an opthalmologist recommended Purilube eye drops. Plaintiff has requested that he have surgery on the eye, though there is no indication in the record that any physician has recommended such surgery. On May 19, 2003, a non-party nurse noted that Plaintiff was refusing to take the Purilube eye drops. Medical notes in mid-July 2003 indicate that Plaintiff was complaining that his eye drops were causing a burning sensation and blurred vision. On July 16, 2003, a note indicates that Plaintiff again refused the Purilube drops, stating "I don't want that junk." On April 2, 2004, Plaintiff received an opthalmology consultation for suspected glaucoma. Andrew Robinson, M.D. indicated that Plaintiff had "dry eye" and "pterygium," and recommended that Plaintiff use artificial tears, as well as tinted glass for light sensitivity. Plaintiff contends that Defendants should "correct [his] vision," but he is not sure how. (Pl. Dep. 29-30)

On February 20, 2004, Plaintiff commenced the subject action. Following discovery, Defendants moved for summary judgment. In support of their summary judgment motion, Defendants submitted Plaintiff's medical record, along with an affidavit from John Alves, M.D., a physician at Southport. Alves, who treated Plaintiff at both Elmira and Southport, indicates that surgery on Plaintiff's foot was not warranted, according to the opinions of the specialists who examined Plaintiff in 2000 and 2002. Alves further indicates that Plaintiff was permitted to wear "orthopedic footwear" at Southport. Alves also indicates that Plaintiff was not a candidate for back surgery, because x-rays showed only mild degenerative disk disease, and that he was treated with various pain and anti-inflammatory medications. Alves further indicates, with regard

6

to Plaintiff's eye complaints, that Plaintiff was seen by specialists on seven occasions between 2000 and 2004, and that Plaintiff was properly treated. In that regard, Alves indicates that surgery was not warranted for the pterygium. Alves also states that neither Wright nor McGinnis were involved in Plaintiff's treatment, and that they accordingly made no decisions regarding such treatment. Finally, Alves indicates that, based upon his review of Plaintiff's medical record, all of Plaintiff's complaints were addressed appropriately. Dyal-Weaver also submitted an affidavit, in which she indicates that, as a nurse, she did not make final decisions regarding Plaintiff's treatment, and that such decisions were made by facility physicians.

In opposition to Defendants' motion, Plaintiff submitted various documents, many of which involve matters that occurred well after the subject action was commenced, and which are not relevant to this lawsuit. Plaintiff also submitted an affidavit, in which he raises various issues which he contends necessitate a trial. With regard to Dyal-Weaver, Plaintiff contends that she violated his rights by telling him, in August 2002, that he would have to use his own money to obtain a second opinion regarding foot surgery.[3] Further, Plaintiff alleges that Wright violated his constitutional rights by refusing to approve Plaintiff's request for orthopedic footwear, and by denying Plaintiff's request for foot surgery in 1998. Plaintiff alleges that Lopez violated his constitutional rights in January 2000, when he told Plaintiff that he was not a candidate for foot

---

[3]Plaintiff also alleges that in March 2006, Dyal-Weaver told him that he "would not be getting his . . . ultram medication much longer." However, in addition to the fact that Dyal-Weaver was not the one to prescribe or discontinue Plaintiff's medications, this incident allegedly occurred two years after Plaintiff commenced this action, and is not part of this action. Plaintiff also contends that at unspecified times Dyal-Weaver "harassed" him and gave him wrong medications. However, these allegations are too vague and conclusory to create a triable issue of fact.

surgery. Additionally, Plaintiff maintains that McGinnis violated his constitutional rights in June 2004, when he affirmed the denial of Plaintiff's inmate grievance seeking the right to wear orthopedic shoes. In that regard, Plaintiff indicates that he was allowed to wear orthopedic shoes from the time he arrived at Southport until June 2004. (Pl. Aff. [#44-1] ¶ 16) However, he alleges that in June 2004, his ability to wear orthopedic shoes was taken away in retaliation for his filing grievances. *Id*. Notably, however, Plaintiff indicates that McGinnnis based his determination on the recommendation of an unnamed nurse practitioner, quoting McGinnis' determination as follows:

> Per N.P. [nurse practitioner] no need for orthopedic shoes while in limited [confinement] Grievant's medical issue has been investigated by the facility nurse administrator who has reviewed grievant Encarnacion's relevant medical record. There is no current order for special footwear.

*Id*. Finally, Plaintiff alleges that McGinnis violated his constitutional rights by failing to respond positively to Plaintiff's written complaints, by "stepping in and fixing the medical problems." *Id*. at ¶ 33.

At around the same time that Defendants filed their summary judgment motion, Plaintiff filed an application for injunctive relief [#31], complaining that he was being denied medical care in retaliation for this lawsuit. Subsequently, Plaintiff filed a second such application for injunctive relief [#47]. Because these applications for injunctive relief primarily involve persons who are not parties to this action, and concern matters different than the specific claims in this action, and because the Court is granting summary judgment, Plaintiff's applications for injunctive relief [#31] [#47] are denied. *Vega v. Lantz*, No. 3:04CV1215(DFM), 2006 WL 2642416 at *2 (D.Conn. Sep. 14, 2006) ("To prevail on a motion for preliminary injunctive relief, the moving party must establish

a relationship between the injury claimed in the motion and the conduct giving rise to the complaint.") (citation omitted). [4]

## DISCUSSION

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof

---

[4] After the close of discovery, Plaintiff filed the two aforementioned applications for injunctive relief [#31] [#47]. In the first, Plaintiff complained that non-parties Peter Bernard [sic], M.D. and Jill Northrop, Nurse Practitioner, were retaliating against him by discontinuing his pain medication and by generally denying him medical treatment for problems including knee and back pain, and rectal bleeding. Ralph Barnard, M.D. filed a responsive affidavit, in which he indicated that Plaintiff's pain medications were discontinued because Plaintiff refused them. Barnard further indicated that Plaintiff's rectal bleeding was due to internal hemorrhoids, for which plaintiff had been referred for a surgical consultation, and that Plaintiff had refused to go to the consultation. Barnard further indicated that Plaintiff had received surgery on his knee, but had refused to participate in physical therapy. In his second application for injunctive relief, Plaintiff alleged that Heman Fowler, a Nurse Practitioner at Southport, was denying him Ultram pain medication. Plaintiff further alleged in conclusory fashion that Dyal-Weaver and others were conspiring to retaliate against him and were refusing to see him on sick-call rounds. Nurse Administrator Kathy Felker responded to Plaintiff's petition, and indicated that Plaintiff's pain medication was discontinued in July 2007 because he was hoarding the medication. Felker further indicated that Plaintiff's pain medication was resumed on July 23, 2007, with the medication being provided in crushed form to prevent Plaintiff from hoarding it. Felker also indicated that Plaintiff had refused to allow a doctor to perform a rectal examination concerning Plaintiff's complaints of rectal bleeding, and that Plaintiff had been scheduled to undergo eye surgery, but that the surgery was cancelled after Plaintiff refused to undergo preoperative procedures. Finally, Felker indicated that Plaintiff was being seen at least three times daily by the nurse dispensing his pain medications.

at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v.*

*Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)(citations omitted).[5]

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
>
> \*\*\*
>
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

Plaintiff is asserting Eighth Amendment claims for denial of medical treatment. The standard for such claims is clear:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious

---

[5] Defendants provided the *pro se* Plaintiff with the *Irby* notice required by Local Rule 56.2.

11

> medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.
>
> Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations omitted). Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. *See, Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998)("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id*. (citation omitted).

In applying these principles of law, the Court recognizes, since Plaintiff is proceeding pro se, that it is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). Having done so, the Court nevertheless finds that Defendants are entitled to

summary judgment. The Court reaches this conclusion because it is clear that the most serious matters about which Plaintiff complains, i.e., that he was denied surgery for his various ailments, amount to disagreements over treatment, which are not actionable as constitutional violations. More specifically, Plaintiff relies only on his own subjective belief that he should have surgery. Moreover, even if Plaintiff could demonstrate that constitutional violations occurred, he has not shown that any of the four defendants was personally involved.

*Nurse Dyal-Weaver*

Plaintiff has failed to demonstrate any triable issue of fact as to Dyal-Weaver. In this regard, Plaintiff's action against Dyal-Weaver hinges on his complaint that, after Dr. Kaempfe declined to recommend surgery in August 2002, Dyal-Weaver told Plaintiff that he would have to use his own funds to obtain a second opinion. However, Plaintiff has not shown that Dyal-Weaver's response was incorrect, or that she was involved in the decision to deny surgery. Nor has Plaintiff otherwise shown that Dyal-Weaver was personally involved in any of the other alleged lapses in medical care.[6] Consequently, Dyal-Weaver is entitled to summary judgment.

*Dr. Lopez*

Plaintiff alleges that Lopez violated his rights in January 2000, when he declined to recommend surgery on Plaintiff's foot. Plaintiff, though, did not commence this action

---

[6]Moreover, while Plaintiff additionally alleges that Dyal-Weaver made various statements to him, indicating that she did not care about his medical problems, Plaintiff cannot have any firsthand knowledge of what Dyal-Weaver said, since he adamantly maintains that he cannot speak or understand English, and therefore was not able to converse with Dyal-Weaver. Instead, Plaintiff bases these allegations on hearsay allegedly told to him by inmates in adjoining cells, whose names he claims not to know, who allegedly overheard Dyal-Weaver's comments. These allegations are not evidentiary proof in admissible form, and even if they were, they still would not raise a triable issue of fact concerning the claims in this case.

until February 2004.  Consequently, any claim against Lopez is time-barred. Furthermore, Plaintiff has not shown that Lopez was deliberately indifferent to his serious medical needs.  Plaintiff merely indicates that Lopez told him that, since Plaintiff's request for surgery had been denied by the Review Committee, Plaintiff would have to live with his foot condition.  Lopez was not involved in the Committee's decision to deny Plaintiff's surgery.  Additionally, Plaintiff has failed to establish that Lopez acted with deliberate indifference in failing to independently recommend surgery.  Neither has Plaintiff shown that Lopez was involved in any of the other alleged instances of denial of medical treatment.  Accordingly, Lopez is entitled to summary judgment.

*Dr. Wright*

Plaintiff maintains that Wright is responsible for the Review Committee's denial of Plaintiff's request for foot surgery, as well as his other requests for medical treatment.  It is unclear why Plaintiff believes this, apart from the fact that Lopez allegedly told Plaintiff that Wright had denied Plaintiff's request for foot surgery in 1998.  However, even assuming that Wright was behind the Review Committee's decision to deny Plaintiff's foot surgery in 1998, as Plaintiff maintains, any claim arising from that decision was time-barred when Plaintiff commenced this action some six years later.  Plaintiff has not come forward with evidentiary proof in admissible form that Wright was involved in any of the other alleged violations.  Consequently, Wright is entitled to summary judgment.

*Superintendent McGinnis*

Plaintiff contends that McGinnis violated his constitutional rights by denying his grievances, and by refusing to "step in and fix the medical problems."  However, McGinnis is not a doctor.  By Plaintiff's own admission, McGinnis relied on the opinions of

14

Southport's medical staff in making the complained-of determinations. Consequently, Plaintiff has not shown that McGinnis was deliberately indifferent to his medical needs. *Moore v. McGinnis*, No. 01-CV-6588 CJS(F), 2004 WL 2958471 at *11 (W.D.N.Y. Dec. 20, 2004) ("Superintendent McGinnis cited and relied upon the opinions of the medical personnel regarding the proper course of treatment for plaintiff and, therefore, was not personally involved. Since McGinnis is not a physician, he could not supervise the medical care delivered by a physician.") (citation omitted). McGinnis is therefore entitled to summary judgment.

## CONCLUSION

Accordingly, Defendants' application for summary judgment [#32] is granted. Plaintiff's applications for injunctive relief [#31] [#47] are denied, for the reasons stated above, and this action is dismissed with prejudice.

So Ordered.

Dated: Rochester, New York
September 28, 2007

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge